J-S04018-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS: A.T.V., A MINOR | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| APPEAL OF: H.M., MOTHER | : | No. 1243 MDA 2020 |

Appeal from the Decree Entered September 8, 2020
In the Court of Common Pleas of Centre County
Orphans' Court at No:  2019-4293a

BEFORE:  OLSON, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY STABILE, J.:          **FILED: APRIL 1, 2021**

H.M. ("Mother") appeals from the decree entered September 8, 2020, which terminated involuntarily her parental rights to her son, A.T.V. ("Child"), born in May 2003.[1]  After careful review, we affirm.

Our review of the record reveals that Centre County Children and Youth Services ("CYS") filed an application for emergency protective custody of Child and a shelter care application on April 27, 2018.  Therein, CYS averred that it received a referral on April 20, 2018, alleging that Mother emotionally abused Child.  Child had punched a wall, fracturing a bone in his hand, and had self-inflicted cuts on his arm.  Child reported that he inflicted the cuts because of stress that Mother was causing him, and that he was afraid to return to her care because he might continue to harm himself.  CYS averred that it arranged

_____

[1] The trial court entered a separate decree terminating the parental rights of Child's father, A.V., involuntarily on December 16, 2019.  A.V. did not appeal.

for Child to spend a week away from Mother at Burrowes Street Youth Haven. Meanwhile, Mother refused to consent to surgery necessary for the fractured bone in Child's hand to heal correctly.[2]  The trial court issued an emergency protective custody order dated April 27, 2018, followed by a shelter care order dated April 30, 2018.  CYS filed a dependency petition on May 1, 2018, and the court adjudicated Child dependent by order dated June 7, 2018.  In the order, the court directed that Mother could not have contact with Child until recommended by a mental health counselor.  CYS filed a petition for special relief on June 22, 2018, requesting that the court deem Mother a perpetrator of abuse pursuant to the Child Protective Services Law.  The court granted the petition and made an abuse finding by order dated November 8, 2018.

Following the adjudication of dependency, Mother did little if anything to reunify with Child.  She refused to cooperate with Family Intervention Crisis Services ("FICS"), the agency assigned to provide reunification services.  CYS requested that Mother obtain a psychological or psychiatric evaluation, and participate in trauma counseling, but she failed to comply with either request. Mother went so far as to state that she had no intent of trying to reunify with

_____

[2] The reasons for Mother's refusal apparently changed over time.  The trial court found that Mother's initial refusal was because "she wanted to observe the procedure being performed and stated that she did not want [Child] to be under full anesthesia due to religious reasons."  Petitioner's Exhibit 9 (Order of Adjudication and Disposition) at 7.  Mother then claimed that "in their family there were allergies to anesthetic" but failed to provide CYS with records to support this assertion.  N.T., 3/9/20, at 28-30, 74-76.

Child through CYS, and that she would simply wait until he turned eighteen in May 2021. She later relocated to Philadelphia and refused to confirm her new address.

On May 20, 2019, CYS filed a petition to terminate Mother's parental rights to Child involuntarily. The trial court conducted a hearing on the petition on March 9, 2020, and September 2, 2020.[3] Subsequently, on September 8, 2020, the court entered a decree terminating Mother's rights. Mother timely filed a notice of appeal on September 28, 2020, along with a concise statement of errors complained of on appeal.

Mother now raises the following claims for our review:

> I. Did the trial court commit an error of law or an abuse of discretion in permitting the h[ear]say testimony of the CYS caseworker at the March 9, 2020 hearing?
>
> II. Did the trial court commit an error of law and/or abuse of discretion in concluding that [CYS] presented clear and convincing evidence to support involuntary termination of parental rights?

Mother's Brief at 6 (unnecessary capitalization and the trial court's answers omitted).

Mother argues in her first claim that the trial court erred or abused its discretion by admitting alleged hearsay testimony at the termination hearing. "[T]he decision of whether to admit or exclude evidence is within the sound discretion of the [trial] court. A reviewing court will not disturb these rulings

---

[3] The trial court permitted a single attorney, Parviz Ansari, Esquire, to act as both Child's legal counsel and guardian *ad litem* during the termination proceedings, based on Attorney Ansari's petition averring that there was no conflict between Child's legal and best interests.

absent an abuse of discretion. Discretion is abused if, inter alia, the [trial] court overrides or misapplies the law." ***In re A.J.R.-H.***, 188 A.3d 1157, 1166-67 (Pa. 2018) (citations omitted).

Our Rules of Evidence define "hearsay" as "a statement that . . . (1) the declarant does not make while testifying at the current trial or hearing; and . . . (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Hearsay is generally inadmissible. Pa.R.E. 802. Mother's argument involves two exceptions to the rule against hearsay, which provide as follows:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> ***
>
> **(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.
>
> ***
>
> **(6) Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
>
> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(3) and (6).[4]

In her brief, Mother focuses primarily on challenging the testimony of CYS casework supervisor Leslie Young, who described numerous referrals CYS received preceding Child's placement in foster care, as well as statements that those referrals alleged Child had made. Mother's Brief at 13-14. Mother also challenges the testimony of former CYS caseworker supervisor Casey Rockey, who described other statements by Child. *Id.* at 14, 18. Mother argues that the court admitted this testimony based on an erroneous application of Rules

---

[4] Pennsylvania law features two versions of the exception memorialized at Rule 803(6). The second version is the Uniform Business Records as Evidence Act, which provides as follows:

> **(b) General rule.--**A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.
>
> **(c) Definition.--**As used in this section **"business"** includes every kind of business, profession, occupation, calling, or operation of institutions whether carried on for profit or not.

42 Pa.C.S.A. § 6108(b)-(c).

803(3) and (6). Specifically, she contends that CYS did not present an actual copy of its "records" pursuant to Rule 803(6), which was necessary for the rule to apply, and that the records would have been inadmissible even if CYS had presented a copy, because they contained multiple levels of hearsay. *Id.* at 12-18. Mother further maintains that Child's statements were not indicative of his state of mind pursuant to Rule 803(3). *Id.* at 17-18.

Before considering the merits of this claim, we address CYS's argument that Mother failed to preserve it for our review by submitting a vague concise statement. CYS's Brief at 5-8; *see Lineberger v. Wyeth*, 894 A.2d 141, 148 (Pa. Super 2006) (explaining that a vague concise statement will result in waiver just as if the appellant had filed no concise statement at all). In her concise statement, Mother asserted that the trial court erred by "admitting the hearsay testimony of a CYS caseworker at the March 9, 2020 hearing[.]" Concise statement, 9/28/20, at 2. We conclude that this assertion of error was sufficient to preserve a challenge to Ms. Young's testimony. Mother's counsel objected to Ms. Young's testimony repeatedly at the hearing and even requested that the court strike the testimony in its entirety. N.T., 3/9/20, at 8-12, 16, 19-21, 45-47, 60-64. It was reasonably clear, and the court was able to discern, that Mother's claim related to Ms. Young. However, Mother's objections and concerns regarding Ms. Rockey's testimony were more limited, and nothing about the phrasing of her concise statement would have alerted the court that she wished to challenge Ms. Rockey's testimony in addition to

- 6 -

Ms. Young's testimony. Thus, Mother waived any arguments regarding Ms. Rockey. *See Lineberger*, 894 A.2d at 148.[5]

We now turn our attention to Mother's challenge regarding Ms. Young. At the hearing on March 9, 2020, Ms. Young explained that she reviewed CYS's records and took notes. N.T., 3/9/20, at 47-48. She acknowledged, however, that she had no personal knowledge regarding anything that happened prior to Child's initial placement in foster care on April 27, 2018, which included the numerous prior referrals about which she was testifying. *Id.* at 57. CYS did not present its records for admission, nor did it argue that Ms. Young's notes were "records" or seek to admit them. Mother's counsel objected repeatedly, and the trial court overruled the objections, apparently accepting CYS's view that Ms. Young was testifying from a "business record." *Id.* at 8-12, 16, 19-21, 45-47, 60-64. The court addressed Mother's claim in its opinion as follows, in relevant part:

> . . . . Ms. Young's testimony providing background information about the events in the case also fall[s] under an exception to the hearsay rule. Ms. Young's testimony was based on CYS reports

---

[5] We observe that Mother's concise statement included a parenthetical stating that "[i]t should be noted that counsel for Mother does not have the benefit of a transcript in framing this issue." Concise statement, 9/28/20, at 2. The absence of a transcript did not excuse Mother's counsel from presenting claims with sufficient clarity. Pa.R.A.P. 1925(c)(2) provides that, "[u]pon application of the appellant and for good cause shown, an appellate court may remand in a civil case for the . . . supplementation of a timely filed and served Statement[.]" *See also* Pa.R.A.P. 1925(b)(2)(i)-(ii) (allowing for the filing of an amended or supplemental concise statement "[u]pon application . . . and for good cause shown," or for the filing of a motion for extension of time). Mother did not comply with this procedure.

and referrals which are considered records of a regularly conducted activity. The records are records of a regularly conducted activity because they were made at or near the time of the event by someone with knowledge, the records were kept in the course of a regularly conducted activity of CYS, making the records was a regular practice of CYS, all of these conditions were shown by the testimony of a qualified witness (Ms. Young), and Mother did not show that the source of the information or other circumstances indicated a lack of trustworthiness. *See* Pa.R.E. 803(6).

Trial Court Opinion, 10/12/20, at 7-8.

The trial court is mistaken in its analysis. Rule 803(6) permits admission of a "record," such as a "memorandum, report, or data compilation[.]" Pa.R.E. 803(6). It does not permit a witness to testify as to the contents of a record that is not present, or being offered for admission, merely because he or she purports to have read that record and taken notes at some unspecified time in the past. *See* Pa.R.E. 1002-1004 (providing that a party must generally produce an original or duplicate to prove the contents of a document). The premise underlying Rule 803(6) is that the statements in a record are reliable despite their hearsay character when the record satisfies certain conditions. *See Bayview Loan Servicing LLC v. Wicker*, 206 A.3d 474, 483 (Pa. 2019) ("[T]he circumstantial trustworthiness arises from the regularity with which business records are kept and the reliance that businesses place on the accuracy of those records."). Clearly, the testimony of a witness relaying his or her interpretation of what a record said lacks the same indicia of reliability.[6]

---

[6] The same reasoning applies to the Uniform Business Records as Evidence Act, which refers specifically to the "admission" of a "record." 42 Pa.C.S.A. § 6108(b).

Nonetheless, we conclude that the admission of Ms. Young's disputed testimony was harmless and does not entitle Mother to relief. *See A.J.R.-H.*, 188 A.3d at 1175 ("[F]inding harmlessness in a termination case requires us to conclude that the evidentiary error could not have had any impact upon the [trial] court's decision."). The same information regarding referrals entered the record through multiple sources. Even if the trial court had sustained the objections of Mother's counsel, the record still contains testimony and exhibits detailing the referrals as well as Child's alleged statements contained in those referrals. The court discussed the referrals exhaustively in its findings of fact accompanying the order adjudicating Child dependent on June 8, 2018. *See* Petitioner's Exhibit 9 (Order of Adjudication and Disposition). Child and Mother also testified regarding the referrals. N.T., 9/2/20, at 29-31, 72, 81-95. Indeed, Mother acknowledged that there were so many referrals that she suggested to CYS that it put a "cap" on the number of referrals that could be made regarding a single family. *Id.* at 90-91 ("I felt . . . something should be done, to have a cap be put on . . . every single one was unfounded . . . it's something that should not have been able to be utilized after that time or maybe for a certain amount of time."). Accordingly, while the court committed an abuse of its discretion by admitting Ms. Young's disputed testimony, we need not disturb the termination decree for that reason. Mother's first claim fails.

Mother's second claim assails the sufficiency of the evidence supporting the involuntary termination of her parental rights. Our standard of review in involuntarily termination matters is as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

- 10 -

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), and (b).  We need only agree with the court as to any one subsection of Section 2511(a), in addition to Section 2511(b), to affirm.  **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).  Here, we analyze the court's decision to terminate pursuant to Sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
>
> ***

23 Pa.C.S.A. § 2511(a)(2), (b).

Trial courts adhere to the following analysis when considering whether to grant a termination petition pursuant to Section 2511(a)(2):

> . . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Mother's claim involves two key points, both of which relate to the trial court's Section 2511(a)(2) analysis. First, she argues that she completed the services necessary to reunify with Child, "although possibly not in the manner required or requested by [CYS]." Mother's Brief at 12, 20-24. Second, she argues that Child's testimony during the hearing showed he was not lacking essential parental care while he was living with her. *Id.* According to Mother, Child's testimony revealed that he resented her disciplinary style and doing chores, and that he prefers his foster parents simply because they are more permissive. *Id.*

The trial court explained its decision to terminate pursuant to Section

2511(a)(2) as follows, in relevant part:

. . . . Mother has demonstrated a repeated and continued incapacity, abuse, neglect and refusal that has caused the [c]hild to be without essential parental control or subsistence necessary for his physical and mental well-being. Mother has demonstrated an inability to appropriately care for the physical, emotional, and mental well-being of the [c]hild. Mother knew the [c]hild was exhibiting self-harm behaviors, but failed to ensure the [c]hild was receiving counseling to properly address his behavior. CYS and the [c]hild testified Mother repeatedly physically hit the [c]hild and the two would often argue. The Court previously found Mother emotionally abused the [c]hild, which led to his self-harming behaviors and endangered his physical and mental well-being. Mother demonstrated her inability to perform parental duties for the [c]hild through her actions and her refusal to act in the [c]hild's best interests.

Mother was offered reunification services for years in order to reunite with the [c]hild. Mother was generally uncooperative and her efforts were minimal and inconsistent. Despite reunification efforts, Mother failed to take advantage of the services offered by CYS and FICS, such as counseling or parenting classes. Mother failed to provide personal and financial information, such as her address, pay stubs, and income statements. Mother refused to submit to agency-approved drug tests. Mother also failed to actively reach out and attempt to maintain contact with the [c]hild. Mother demonstrated aggression and anger towards service providers, and otherwise did not listen to their guidance and advice.

Further, the conditions and causes of the incapacity, abuse, neglect and refusal ha[ve] not been and will not be remedied by Mother. Mother never recognized or took responsibility for the problems which led to the [c]hild's placement, and never took action to remedy the concerns CYS and FICS had about the [c]hild remaining in or returning to Mother's care. Mother did not properly avail herself of the services offered by the agencies, and failed to show she had made progress in reaching goals necessary for reunification. Mother did not progress in her goals or show improvement in her parenting ability, and never advanced to supervised visits with the [c]hild. Mother stated she would no

- 13 -

longer cooperate with reunification services, and CYS and FICS were never permitted in her home for lifestyle checks, drug screens, or assessments. Mother was unwilling and ultimately refused to remedy the conditions and causes of the [c]hild's placement.

. . . . Here, Mother has not fulfilled her affirmative obligation to act in the [c]hild's best interest. There were twelve referrals between 2011 and 2018 showing Mother repeatedly failed to provide a safe and healthy environment to ensure the [c]hild's physical and mental well-being. She has refused to cooperate with the agencies involved in her case, and has failed to make progress toward remedying the issues which led to placement of the [c]hild in the first place. As such, grounds were established under Section 2511(a)(2) to terminate Mother's parental rights.

Trial Court Opinion, 10/12/20, at 10-12.

Our review of the record supports the trial court's decision. As detailed above, Child entered foster care following an incident in April 2018. Child had punched a wall, fracturing a bone in his hand. Petitioner's Exhibit 9 (Order of Adjudication and Disposition) at 7. Child also had self-inflicted cuts on his arm and disclosed that he inflicted the cuts because of Mother's behavior. *Id.* He did not want to return to Mother's care, "as he was fearful of what he may do if he were in that home." *Id.* Meanwhile, Mother had prevented Child from receiving surgery necessary for his hand to heal correctly. *Id.*; N.T., 3/9/20, at 28-30, 74-76. The trial court adjudicated Child dependent and entered an order deeming Mother a perpetrator of child abuse.

Following the adjudication, Mother did seemingly nothing to reunify with Child for nearly two years. Ms. Rockey testified that CYS referred Mother for reunification services through FICS, but that Mother refused to work with that

agency.  N.T., 3/9/20, at 70, 83, 89-90, 144-45.  CYS asked Mother initially that she participate in random drug and alcohol screens due to her emotional dysregulation.  *Id.* at 76, 147-48.  CYS later eliminated that requirement and requested that she obtain a psychological or psychiatric evaluation and trauma counseling.  *Id.* at 76-77, 147-48.  Ms. Rockey reported that Mother agreed to obtain an evaluation and counseling in August 2018 but did not provide CYS with information indicating that she complied with that agreement prior to the hearing.  *Id.* at 77-79, 82-84, 104, 121-24, 165.  To Ms. Rockey's knowledge, Mother's only participation in services was a parenting class she took while incarcerated for a probation violation from August 2018 until November 2018[7] and an "anger management yoga" class.[8]  *Id.* at 79-80, 107, 118, 122.

Perhaps most significantly, Mother informed Ms. Rockey that she had no intention of pursuing reunification with Child.  Ms. Rockey testified regarding a meeting during which Mother stated, "I don't even know why I'm bothering. I'm going to just wait two years [until Child turns eighteen].  He'll do what he

---

[7] Ms. Rockey testified that Mother was on probation because of a prior felony assault conviction.  N.T., 3/9/20, at 80.  Mother denied that she violated her probation, contending, "[t]hey held me for four months because of allegations of a public disturbance . . . . and after they said the allegations were not founded they let me go."  *Id.* at 193-96.

[8] Mother submitted exhibits at the hearing indicating that she completed a parenting program in April or May 2019, as well as "Anger Management and Therapeutic Transformation Yoga" in April 2019.  *See* Mother's Exhibits 4-6. She explained that she completed one parenting program while incarcerated and then an additional parenting program later.  N.T., 9/2/20, at 37, 128.

wants." *Id.* at 92. Mother subsequently moved away from Child and relocated to Philadelphia sometime between November and December 2018. *Id.* at 88, 145. Mother refused to confirm where she was living, and CYS was only able to obtain her mailing address from her probation officer. *Id.* at 82, 88, 104, 122, 157. Throughout this time, Mother was having no in-person contact with Child whatsoever, due to the trial court's order prohibiting contact unless a mental health counselor recommended it.[9] *Id.* at 72, 101-03, 114-15, 144-47.

While the record reveals that Mother eventually did make a token effort to complete services by obtaining psychiatric and psychological evaluations, she did not do so until March 3, 2020, six days prior to the start of the hearing, and did not provide the evaluations to CYS until the middle of the second day of the hearing, on September 2, 2020. N.T., 9/2/20, at 116, 179; *see also* Mother's Exhibits 2 and 3 (psychiatric and psychological evaluations). Mother also stated that she was participating in counseling, but that she did not begin meeting with her current counselor until "[a]round the same time that we did

---

[9] Mother testified that she believed the trial court's order precluded her from having any form of contact with Child but discovered for the first time in May 2020 that she was able to send him written correspondence. N.T., 9/2/20, at 144-47. She indicated that she sent Child approximately "two or three" pieces of correspondence since that time. *Id.*

the evaluation, I believe."[10]  N.T., 9/2/20, at 119.  These minimal efforts, after years of inactivity, are insufficient to prevent the involuntary termination of Mother's parental rights.  **See In re Adoption of K.J.**, 936 A.2d 1128, 1133 (Pa. Super. 2007), *appeal denied*, 951 A.2d 1165 (Pa. 2008) ("[P]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities.  A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.") (citations omitted).

Finally, we reject Mother's contention that Child's testimony showed he was not lacking essential parental care while he was living with her.  Child did not merely complain about doing chores as Mother suggests but described physical violence.  **See** N.T., 9/2/20, at 25 ("Whenever she was frustrated, she would shout.  She would hammer fist my chest.[11]  She would shove me.  She would slap me across the face.").  As this Court has emphasized, the trial court was "free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."  **In the Interest of D.F.**, 165 A.3d 960, 966 (Pa. Super. 2017).

---

[10] Mother's testimony on the issue of counseling was somewhat unclear.  She indicated that she was undergoing counseling prior to her current counseling, but that "it wasn't I guess, what you'd call formal counseling[,]" and that she did not receive "more formal" counseling until later.  N.T., 9/2/20, at 40.

[11] Child described "hammer fisting" as "the motion of making a hammer to contact with anyone."  N.T., 9/2/20, at 30.

To the extent Mother proposes that the court should have interpreted Child's testimony differently or should have accepted her testimony over that of CYS's witnesses, her argument is meritless. *Id.* Thus, because the record supports the court's determination that Mother's incapacity, abuse, neglect, or refusal has caused Child to be without essential parental care, control, or subsistence, and that Mother cannot or will not remedy her incapacity, abuse, neglect, or refusal pursuant to Section 2511(a)(2), Mother's second claim fails.[12]

Based on the foregoing, we conclude that Mother's claims do not entitle her to relief, and we affirm the September 8, 2020 decree terminating her parental rights to Child involuntarily.

Decree affirmed.

---

[12] Mother does not develop a challenge in her brief regarding Section 2511(b). As a result, any such challenge is waived. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority."). Even if Mother had developed a challenge regarding Section 2511(b), we would conclude that it was meritless. Mother and Child have not spoken since April 2018, and Child expressed his support for termination of Mother's parental rights during the hearing. N.T., 9/2/20, at 9, 33-34, 96. Child testified that he considers his foster parents to be his parents and wants them to adopt him. *Id.* at 5, 10. Accordingly, termination will best serve his needs and welfare.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>04/01/2021</u>